# CHARLESTON

## NEWMAN v. NEWMAN.

Submitted March 13, 1906.    Decided October 23, 1906.

1. WILLS— *Construction—Nature of Estate.*
   The will below does not vest in the widow an absolute fee estate, but vests in her a life estate and creates a trust in her as trustee for the benefit of her children.   (p. 373.)

2. TRUSTS—*Constructive Trusts--Laches.*
   The defense of *laches*, though not applying, as a general rule, to an express trust, does apply to a constructive trust.   (p. 376.)

3. SAME—*Enforcement.*
   Where a trustee holding under an express trust uses the trust property in the purchase and conveyance of land to another, in violation of the trust and with notice of it, it creates a constructive, not an express trust, in that third person, and *laches* will apply in favor of such person as a defense against the enforcement of such trust.   (p. 376.)

4. ADVERSE POSSESSION—*Coal in Place.*
   The statute of limitations, for want of adverse actual possession, does not apply in favor of one claiming coal in state of nature in place, not developed.   (p. 377.)

Appeal from Circuit Court, Mason County.

Bill by I. V. Newman and others against W. C. Newman and others.   Decree for plaintiffs, and defendants appeal.
                              *Reversed.    Bill Dismissed.*

JOHN E. BELLER and RANKIN WILEY, for appellants.

JOHN W. ENGLISH, W. R. GUNN and C. E. HOGG, for appellees.

BRANNON, JUDGE:

Isaac Newman died in 1836 leaving a will and a large estate consisting of various tracts of land and slaves and other personal property.   His will contained the following provisions:   "I do hereby authorise my beloved widow to dispose of my property real and personal when it shall be for the benefit of the family and in all cases it shall be legal in law for the benefit of my eight children namely Junius Eastham Newman, Virginia Eastham Newman, Mary Cathrine Newman, William Walter Newman, John Green Newman, Susan Ann

Newman, Sarah Jane Newman, Isaac Vanburen Newman and if any other shall be born to my wife within nine months after my death. And the court is not to require security for the faithful discharge as I have unbounded confidence in her virtue and love for the interest of those she is left to protect. Subject however to the possibility that she should become the wife of another man in that event she is to surrender my childrens' property as before named to my *brother-in-laws* William George and Albert G. Eastham, who I do appoint my executors in that contingency.'' He left a number of children. Mary Newman, the widow, made deeds to different children of different tracts of land vested in her by the will, and by her will devised other lands to some of the other children, leaving out W. W. Newman, her son. To her said son she conveyed the half of the home farm of three hundred and eigthty-four acres. The controversy in this case arises from the fact that the widow, Mary Newman, conveyed to Luman Gibbs a small tract of land vested in her by her husband's will in exchange for the coal in a tract of four hundred acres of land owned by Gibbs, and Gibbs conveyed said coal to W. W. Newman. Thus, Mary Newman purchased said coal with land which she derived under her husband's will. I. V. Newman and others, as children and grandchildren of said Isaac Newman and Mary Newman, brought a chancery suit against the heirs of W. W. Newman, claiming that as the said four hundred acres of coal was purchased with land of the estate of Isaac Newman it was a trust estate in the hands of W. W. Newman for the common benefit of all those interested in the estate of Isaac Newman; that Mary Newman held the land which she conveyed to Gibbs in trust for the benefit of the children of her husband, and that W. W. Newman was well aware of such trust and took the deed for the said coal with notice of such trust, and therefore held it subject to their rights, and asked a partition thereof for the common benefit of all entitled under the will of Isaac Newman. The circuit court of Mason county sustained the plaintiffs' claim, holding the land in the hands of the heirs of W. W. Newman to be still subject to the trust created by the will and imposed upon Mary Newman as trustee under it, and decreed that the said

coal be partitioned. From this decree the heirs of W. W. Newman have appealed.

The first question that arises in the case is this. The defence contends that the will vested in Mary Newman an absolute estate in fee, for her own absolute use, to be conveyed away as she might choose, without any account to the children of her husband; whilst the plaintiffs claim that the will created an exprees trust in Mary Newman, by which she held the estate in trust for the benefit of the children of her husband, saving a life estate to herself. The defence relies upon that rule of law given in many decisions, that where a will devises land to a person to dispose of at his pleasure such devisee has the absolute property, even though his interest is called by the will a life estate, and there is a provision whereby what may remain undisposed of at the death of the devisee goes to another person. *Melson* v. *Dough*, 4 Leigh 439; *Milhollen* v. *Rice*, 13 W. Va. 519; *Wilmoth* v. *Wilmoth*, 34 *Id.* 426; *Englerth* v. *Kellar*, 50 W. Va. 259; *Brown* v. *Strother*, 47 S. E. 236; *Cole* v. *Cole*, 79 Va. 251; *Hall* v. *Palmer*, 12 S. E. 618; *Burwell* v. *Anderson*, 3 Leigh 348. But we hold that this doctrine does not apply to this case, because we think that it is plain that though the testator intended to give the widow a support out of the whole estate, yet he did not intend her to consume the whole for her own purposes, but intended to vest in her the property for the benefit of her children. The will gives her a power of disposition, it is true, and that generally carries the absolute ownership; but if the will evinces a different purpose, that power of disposition does not have that effect. In this case the will, while giving a power of disposition to the widow, yet declares that it is to be exercised for the benefit of the children, naming them. It does not say that she shall exercise the power of sale for her sole use or that she may consume the proceeds. The will says she shall only exercise the power of disposition "when it shall be for the benefit of the family." This shows a restricted power of disposition. It shows that it can only be exercised for the benefit of the family, widow and children together. The very clause constituting the devise, the vital devising clause, tells that the devise to the widow is for the common benefit of the entire family. Moreover, the will makes the devise

subject "to the possibility that she should become the wife of another man; in that event she is to surrender my childrens' property as before named to my brother-in-laws." Now, here the testator calls the property "my childrens' property." And provides for the widow's estate to end on her remarriage. If he intended to give her complete ownership, why this provision? We cannot help thinking that whilst the testator intended to provide amply for his wife out of his large estate, he yet remembered that he had children to be provided for. He reposed full confidence in his wife to deal justly with his children; even in that clause he manifested an intent that his wife should care for and protect his children with the property vested in her. We deem it hardly necessary, on this point, to cite authority, since it is only a question of the purpose of Newman as manifested in his will; but I cite *Cressap* v. *Cressap*, 34 W. Va. 310; *Milhollen* v. *Rice*, 13 *Id.* 510; *Young* v. *Bradley*, 11 Otto 782, as reflecting light on this particular matter. As the will gives power of disposition to the widow for the benefit of the children, counsel ask, who was to say when her act of sale would be proper? We answer, a court of equity, which has power to administer trusts and control trustees. If the will did confer absolute property upon Mary Newman, that would end the case; for she would have perfect right to exchange land which was derived from her husband for the coal and give it to her son, W. W. Newman, free of any trust; but as we deny that the will confers such absolute estate, we must go on with further questions arising in the case.

The plaintiffs properly claimed that the will created only a trust estate in Mary Newman, and they say that as Mary Newman held the land in trust, so did W. W. Newman, and so do his heirs. They say that there is no difference between the tenure of Mary Newman and W. W. Newman. It is undeniable that W. W. Newman, when Gibbs conveyed the coal to him, had full notice of the trust aforesaid. It is settled law that one acquiring trust property with notice of a trust from a trustee is himself a trustee, holding the property on the same trust under which his grantor held it. "A trust fund may be pursued by the beneficiary, as long as the same can be identified, into any land or other form of

investment made by the trustee, as the law raises an implied trust as to such property in their behalf." *Marshall* v. *Hall*, 42 W. Va. 641. See *Crumrine* v. *Crumrine*, 50 W. Va. 226; *Reed* v. *Reed*, 52 S. E. 1023; *Webb* v. *Bailey*, 41 W. Va. 463; *Heth* v. *Richmond R. R.*, 4 Grat. 482; *Vance* v. *Kirk*, 29 W. Va. 344; *Barksdale* v. *Finney*, 14 Grat. 338. The many authorities sustaining this position are collected in that valuable work, American & English Decisions in Equity, Vol. 2, 652, showing that trust funds may be followed up. Hogg's Equity Princ., 763, is full authority on this point. So the right of the plaintiffs to follow up this coal originally is very clear; but they are barred by great lapse of time. The conveyance of the coal to W. W. Newman from Gibbs dates August 16, 1853, and so does the deed from Mary Newman to Gibbs, and this suit was brought in 1902, a great span of forty-nine years, and none of the parties under any disability. But the plaintiffs say that neither the statute of limitations nor *laches* applies. They argue that the statute of limitations does not apply to an express trust and that *laches* does not. "No statute of limitation runs against an express trust, nor does lapse of time avail until the duties are ended or the trust disavowed." *Gapen* v. *Gapen*, 41 W. Va. 422. Express trusts are not liable to the statute, and for the most part not liable to *laches*, though sometimes even an express trust is lost by great lapse of time. See *Wood* v. *Stevenson*, 43 W. Va. 149. That is the law of express trusts, and if Mary Newman held the title to the coal which Gibbs conveyed to W. W. Newman, doubtless the trust would be enforceable against her; but W. W. Newman is not Mary Newman. She would hold under an express trust. He did not. What is the character of trust under which W. W. Newman held? It was not an express trust but a constructive trust. Here lies the controlling distinction in this case. W. W. Newman did not take as a trustee by the terms of his deed, as that is an absolute conveyance to him, thus denying any trusteeship. There is no competent evidence to prove that he agreed to hold in trust. I. V. Newman says he did so; but W. W. Newman being dead and I. V. Newman being a plaintiff and one to be benefited by an enforcement of the trust, his evidence is wholly incompetent. W. W. Newman on the theory of the plaintiff

took his estate in the coal *ex malficio*, that is, in wrong, in fraud of the rights of those interested in the trust. He took in hostility to their rights, not in acknowledgment of their rights. Say that he took in fraud of their rights. Taking, however, with notice of the trust, equity would make him a constructive trustee under a constructive trust, not under an express trust. He never did a thing to recognize any obligation resting on him as trustee, nor did his heirs. Hogg's Eq. Princ. 738, classifies trusts in two general divisions—"direct or express trusts (that is, those springing from agreement of the parties)—and into constructive or implied trusts (that is, those created by the rules and principles of equity). Under this latter class fall all those trusts known distinctively as implied or constructive, as well as those called resultant, those arising from acts of fraud or otherwise, in short, all those that do not spring from the agreement of the parties. A constructive trust is one not created by any words, either expressly or impliedly evincing a direct intention to create a trust, but only by the construction and operation of equity in order to satisfy the demands of justice." I submit that W. W. Newman was not holding under an express trust, but under a constructive trust, one made or created by the law of equity jurisprudence. *Currence* v. *Ward*, 43 W. Va. 367; 2 Minor's Inst. 188; 15 Am. & Eng. Ency. L. (2 Ed.) 1123. This is not a trust assumed by the consent of Newman, but it is imposed upon him against his will by equity law, because he did a wrong in taking property bought with trust property. Such a trust is sometimes called an involuntary trust and sometimes a trust *ex malficio*. "The basis of a constructive trust is fraud, actual or constructive." 15 Am. & Eng. Ency. L. (2 Ed.) 1185. It is in the failure of counsel for the plaintiffs to recognize this distinction between express and constructive trusts that their contention fails. Thus, W. W. Newman holding under a constructive trust is protected by the lapse of forty-nine years. All the plaintiffs knew of his deed as it was at once put on record. Outside of that the evidence fully establishes notice on the plaintiffs of that deed. They were bound to know of it, and did know of it. *Lefferty* v. *Lefferty*, 42 W. Va. 783. True, the statute of limitations does not apply, because the coal was not developed and there was no adverse possession of it, as it was in a state

of nature. *Wallace* v. *Elm Grove*, (52 S. E. 485), 58 W. Va. 449. But this being a suit to enforce a constructive trust that limitation raised by equity law called *laches* does apply. It is not true that limitation and *laches* do not apply to any trust. They do not apply to express trusts, but do apply to constructive trusts. *Woods* v. *Stevenson*, 43 W. Va. 149, holds that, Express trusts, cognizable only in equity, are alone free from limitation created by *laches* or statute. All other trusts, whether legal or equitable, are either subject to the statute of limitations or liable to be barred by *laches*." Hogg's Eq. Princ., sec. 567, plainly makes this distinction, saying that time does not run against a suit to enforce an express trust till the trustee denies the trust and the beneficiary has notice of it; "but those trusts which arise by operation of law, as all constructive trusts, are within the operation of the statute of limitations." Many West Virginia and Virginia authorities are cited by Mr. Hogg. In 28 Am. & Eng. Ency. L. (2 Ed.) 1133, this distinction between express and constructive trusts, for the purpose of limitation, is recognized. There it is stated that when the trust ends in any way the statute runs. The trust of Mary Newman, the express trust, ended with the conveyance by her to Gibbs of trust land, in wrong, for the purchase of the coal. Then it was a hostile claim by W. W. Newman. Then time began to run. A mere constructive trustee may protect himself by limitation. *Sheppard* v. *Turpin*, 3 Grat. 357. *Laches* lies "to suits to charge another with a constructive trust and the like." Hogg's Eq. Princ. p. 417. So the plaintiffs are barred of relief by *laches*. So many years fled away, nearly half a century, from the date of the deed from Mary Newman to Gibbs and the date of the deed from Gibbs to W. W. Newman for the coal, both the same date, 16th of August, 1853, until 1902, when this suit was brought, the adverse parties knowing of those deeds. No stronger case could be presented for the application of the doctrine stated in *Trader* v. *Jarvis*, 23 W. Va. 100, that is, "Delay in the assertion of a right, unless satisfactorily explained, even where it does not constitute a positive statutory bar, operates in equity as an evidence of assent, acquiescence or waiver; and especially is such the case in suits to set aside transactions on account of fraud or infancy. *Laches* and neglect are always

discountenanced by a court of equity." See *Philips* v. *Piney*, 53 W. Va. 543. But the defence of *laches* is rendered clearer still as a bar by the fact that the immediate parties to the transaction, who above all others could speak the truth upon it, had been slumbering in their tombs for many years when this suit was brought. The mother, Mary Newman, died in 1871, seventeen years after the recordation of those deeds. W. W. Newman died in 1884, thirty years after those deeds were made. While Mary Newman and W. W. Newman lived no suit was brought, no claim made. And after W. W. Newman died they waited eighteen years before attacking his children. From appearances these people were people of character. It is not to be presumed that a just mother would do injustice among her children. It is not to be supposed that W. W. Newman, a licensed attorney, and a member of the Virginia Senate, would do a wrong to his brothers and sisters. Why this coal was conveyed to him we do not know. If he and his mother were in life, they might give us a perfect defence and justification of this act, but their lips are sealed, and long have been. It is, however, fair to say that the long acquiesence on the part of the other children in this act of the mother and brother, their long silence while the mother and brother were in life, speaks forcibly to tell us that there is some reasonable justification of this transaction. If there had not been, why this long silence and acquiesence by those deeply interested? It is a strong argument against any action by a court of equity after so long a time that the parties to the transaction are dead so that the truth cannot be known. This is always an argument against relief. *Pucy* v. *Gardner*, 21 W. Va. 469, pt. 6. The disinclination of courts to enforce trusts after long delay is well stated in the opinion by JUDGE DENT and the authorities given in *Woods* v. *Stevenson*, 43 W. Va. 149.

Another argument against any relief lies in the fact that Mary Newman conveyed and devised to various children different tracts of land, some of which have been sold away and others encumbered by deeds of trust, thus involving rights of third parties. How can these lands be brought into hotch-pot?

Another argument advanced by the plaintiffs is that in 1852 the members of the Newman family met and agreed upon a partition of the land orally which was carried partly

into execution by the conveyance by Mary Newman of some lands to some children, and that by that oral family agreement certain of the children were to get the tract of land out of which Mary Newman conveyed a part to Gibbs in exchange for the coal conveyed by Gibbs to W. W. Newman. How can this help the plaintiffs? Saying that that is so it makes their case worse, because it shows that W. W. Newman, in violation of the agreement, diverted the land from the course it was to take by that agreement, and in conjunction with Mary Newman used it to acquire a deed to himself for the coal. If this be so, surely this was no express trust, but purely a constructive trust, an act in character adversely to others under said family agreement, and if possible time applies all the more from that agreement. It cannot be thought for a moment that W. W. Newman by this act became a voluntary trustee. It was an act of wrong against his brothers, the wrong of having the trustee divert the trust property from the use to which it was to go under that family agreement, an act repudiating that agreement. Surely he held not as trustee to execute that agreement. I will add that letters from I. V. Newman and Emma Newman to the children of W. W. Newman treat this coal as the legitimate property of W. W. Newman. I. V. Newman pointed out to W. W. Newman's children the coal land owned by their father and held it out to them as belonging to them. He paid taxes for them on the coal out of their money. Through these many years W. W. Newman and his children paid taxes on this coal, the other parties paying none. This goes to repel a trust, and shows a recognition of W. W. Newman's right as just. If they owned an interest why not help pay taxes? Several of the children in numerous ways recognized the right of W. W. Newman and his children to this coal. A writing signed by W. W. Newman dated 28th November, 1870, is relied upon. It certifies that about 1853 there was an agreement on a division of the property left by Isaac Newman and that by a deed to certain land thereafter he received his portion in full of said estate, and had no claim on the estate of his mother. To what deed does this refer? Both the deed from Gibbs and that from his mother for half the home farm were after that family agreement. It may refer to the deed for the coal.

Anyhow, it is only an admission that he had received his share—it does not meet the defence of *laches*.

What excuse for long delay in suing is given? One that the mother was old, and her children did not wish to disturb her peace. This is no legal excuse. Besides, they would not be suing her, but W. W. Newman. And they waited so long after she died. Another excuse is that W. W. Newman was resident in Virginia. He, and his sons after him, were frequently in Mason county, visiting some of the plaintiffs, and could have been personally served with process. But personal service was not necessary since the suit to enforce the trust by partition or conveyance to the heirs was in nature an *in rem* proceeding.

For these reasons we must reverse the decree of the circuit court and dismiss the plaintiffs' bill without relief.

*Reversed. Bill Dismissed.*