## BANK OF CALIFORNIA, NATIONAL ASS'N, v. McBRIDE.

### In re WESTERN BOND & MORTGAGE CO.
#### No. 10062.

Circuit Court of Appeals, Ninth Circuit.
Jan. 14, 1943.

Felix T. Smith, Marshall P. Madison, Francis R. Kirkham, and Leland B. Groezinger, all of San Francisco, Cal., and Borden Wood, of Portland, Or. (Pillsbury, Madison & Sutro, of San Francisco, Cal., and McCamant, King & Wood, of Portland, Or., of counsel), for appellant.

Teiser & Keller and Sidney Teiser, all of Portland, Or., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

On September 24, 1934, the Western Bond & Mortgage Company, herein called Western, was adjudicated an involuntary bankrupt on a petition filed November 25, 1931. The main controversy here is whether the bankruptcy court had jurisdiction summarily to order appellant to turn over to the trustee a certain ranch determined to be an asset of the bankrupt.[1]

The property in dispute is known as the Russell ranch. The series of backstairs transactions by which this ranch disappeared as an asset of the bankrupt to reappear in the possession of appellant may be held in mind only by a sustained effort of the will.

In 1929 title to the Russell ranch was held by a wholly owned subsidiary of Western, the Russell Land & Livestock Co. During that year Western caused to be organized the Keystone Finance Co. as another wholly owned subsidiary; and on December 20, 1929, the Russell Company conveyed the ranch to Keystone, apparently without consideration. On the same day Keystone executed two mortgages on the ranch in the total sum of $150,000 in favor of Western. These mortgages were promptly recorded. Their amount was greatly in excess of the actual value of the ranch, which was worth about $65,000. A year later the Massachusetts Mortgage Company acquired complete control of Western by purchase of common stock, in connection with which purchase Massachusetts agreed to pay certain obligations of Western to appellant.

Thus matters stood when, on November 25, 1931, the petition to have Western adjudged a bankrupt was filed. At that time Western was indebted to appellant in an amount somewhat in excess of $100,000. The collateral held by appellant as security for this indebtedness was inadequate. In order to furnish added security and to obtain from appellant a cash advance for Massachusetts, one O'Flynn, who owned a controlling interest in the Massachusetts Company and who was by virtue of such control the animating force behind all the corporations involved, proposed to appellant the giving to the latter of a mortgage on the Russell ranch. This was subsequent to the filing of the bankruptcy petition.

The first step implementing the proposed plan was taken in February 1932 when another corporation, the Ochoco Farms Corporation, was formed as a wholly owned subsidiary of the Massachusetts Company. Before Ochoco filed its articles the officers of Keystone adopted a resolution to accept an offer from Ochoco for the Russell ranch. (The president and secretary of Keystone were two women office employees of Western who received no compensation for serving Keystone and who were directed in all their activities by O'Flynn.) Consideration for the offer was 850 preferred shares of Western, which shares Ochoco does not appear to have owned. The deed to Ochoco was executed three days before the articles of that company were filed. Western executed a satisfaction of the two mortgages on the Russell ranch previously given by Keystone, but no consideration appears for this satisfaction.

After Ochoco filed its articles one share of stock was issued to each of three women office employees of Western who had acted

---

[1] The order further required the surrender of certain bonds. The dispute in respect of these bonds will be discussed later in the opinion.

as incorporators, and 847 shares were issued to the Massachusetts Company. A resolution was passed authorizing the officers to execute notes to the Massachusetts Company so that Ochoco could borrow money. Significantly, the amount of these notes—$55,960—was the aggregate of advances previously made by appellant to the Massachusetts Company and the balance of the debt owing appellant by Western, after crediting Western with the value of the collateral which appellant already held. The notes were executed by the same women who had acted as officials of Keystone and who now assumed to be president and secretary of Ochoco. As security for the notes Ochoco executed a mortgage on the Russell ranch.

It was not shown that Ochoco received any money or other consideration for the notes and mortgage, or even that Ochoco had a bank account. On the same day the mortgage was executed the Massachusetts Company assigned it to appellant. All of the pertinent documents, including the deed from Keystone to Ochoco, the satisfaction of the mortgages by Western to Keystone, the mortgage securing the notes from Ochoco to the Massachusetts Company, and the assignment of the mortgage from Massachusetts Company to appellant, were placed in escrow with appellant's attorney pending his determination of the question of title. These instruments were recorded simultaneously on March 2, 1932. Shortly thereafter Western released to appellant title to the collateral theretofore held by appellant as security for Western's indebtedness.

Ochoco made no payments on the mortgage, and appellant foreclosed, a decree being entered October 28, 1933. It is plain that Ochoco performed no function other than that of a conduit through which the Russell ranch passed from the control of Western into the hands of appellant. Ochoco was permitted to expire at once, defaulting immediately in the payment of its license fees and later being dissolved by the state.

The referee's findings, which the court adopted, were that Keystone was at all times operated and manipulated by Western as the latter's adjunct and agent for the sole purpose of carrying out Western's designs; that it was, to appellant's knowledge, a mere corporate shell, functioning solely as the alter ego of Western; that appellant had actual knowledge of the filing and pendency of the bankruptcy petition against Western, of the notes and the mortgages on the ranch given by Keystone to Western, and of the recordation of those mortgages; that it knew of the ownership by Massachusetts of all of the stock of Western, and of the interlocking character of the officers of the various companies.

In the proceeding before the referee an order was issued requiring appellant to show cause why it should not be directed to turn over the property to the trustee. Appellant seasonably objected to the proceeding, contending there, as it does here, that the controversy concerning its right to retain the property was triable only in a plenary suit.

1. The court had summary jurisdiction in the premises if, when the bankruptcy petition was filed, the property was actually or constructively in the possession of the bankrupt; or if at that time possession was held by a person who made no adverse claim to the property, or whose adverse claim was determined on inquiry to be merely colorable. Taubel-Scott-Kitzmiller Co. v. Fox, 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770; Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897; Isaacs v. Hobbs Tie & T. Co., 282 U.S. 734, 51 S.Ct. 270, 75 L.Ed. 645. There is no showing that Keystone, which at that time held the title and technically the possession, made any claim to the property adverse to the bankrupt. Apparently the ranch had been transferred to Keystone as a matter of convenience to Western, its real owner. As the court found, Keystone was not a free agent but a mere dummy. Not only was Western its creator and sole stockholder; its officers were subordinate employees of Western—puppets who were expected unquestioningly to do, and who did, the latter's bidding.

Since Keystone was a mere corporate shell, the naked fact that legally it was a distinct entity was no impediment to the exercise of summary jurisdiction. "The legal existence of the affiliated corporation does not per se give it standing to insist on a plenary suit," Sampsell v. Imperial Paper Corporation, 313 U.S. 215, 218, 61 S.Ct. 904, 907, 85 L.Ed. 1293. So far as our own decision in Adolph Ramish, Inc., v. Laugharn, 9 Cir., 86 F.2d 686, may be thought to intimate the contrary, the authority of that case has been displaced by Sampsell v. Imperial Paper Corporation, supra. The Supreme Court there observed [page 218 of 313 U.S., page 907 of 61 S.Ct., 85 L.Ed.

1293] that "mere legal paraphernalia will not suffice to transform into a substantial adverse claimant a corporation whose affairs are so closely assimilated to the affairs of the dominant stockholder that in substance it is little more than his corporate pocket." Consult further Fish v. East, 10 Cir., 114 F.2d 177. The authorities relied on by appellant are distinguishable.[2]

■ Appellant insists that its claim that it is a bona fide purchaser entitled it to a plenary suit. For this proposition it relies largely on Morrison v. Bay Parkway Nat. Bank, 2 Cir., 60 F.2d 41. That case bears no resemblance to the present. It involved an alleged preferential payment made by the bankrupt prior to the initiation of the bankruptcy proceeding. Here, the allegedly good faith purchase was made after the property had passed into the constructive possession of the bankruptcy court; hence that court had jurisdiction summarily to order its delivery to the trustee. Taubel-Scott-Kitzmiller Co. v. Fox, supra, 264 U.S. pages 432, 433, 438, 44 S.Ct. 396, 68 L.Ed. 770; May v. Henderson, 268 U.S. 111, 45 S.Ct. 456, 69 L.Ed. 870.

■ On its claim of good faith the court found against appellant. It is quite evident that this important asset of the bankrupt was surreptitiously slipped from under the nose of the bankruptcy court with at least the passive connivance of appellant, apparently in the belief that the petition against Western would not eventuate in an adjudication. Appellant argues that it was entitled to rely on the record title and on the advice of its attorney, and that it did not know the bankrupt was interested in the property. But what its attorney knew, appellant knew. At the least, it had knowledge of facts and circumstances strongly indicative of ownership and control by Western, and it is in no position now to plead ignorance of the primary fact which further inquiry would have revealed.

2. After the 1933 foreclosure appellant operated the ranch for several years. The court determined the reasonable rental value for the period of occupancy and ordered appellant to pay the same, less certain credits for taxes and delinquent grazing rentals paid by appellant. It is argued that the court lacked jurisdiction in the summary proceeding to make this affirmative award.

■ No case involving a cognate situation has been called to our attention. For the most part the authorities cited merely announce the familiar principle that contracts of the bankrupt with third persons[3] or claims against third persons sounding in tort[4] are, in the absence of consent, enforceable only in plenary suits. However, the relief obtainable in summary proceedings is not necessarily limited to the recovery of a specific property or fund. Broader relief may be had in appropriate circumstances. Compare May v. Henderson, supra, 268 U.S. 111, 120, 45 S.Ct. 456, 69 L.Ed. 870.

■ In the proceeding before us the rental value was subject to determination and award as a mere corollary, or incident, of the principal right. Since summary jurisdiction existed to compel delivery of the property, wrongfully withheld, it would appear that all questions incidental to the primary one of possession ought to be determined in the single proceeding, not split up into a series of suits. In this way ancillary relief to which the estate is entitled may be had without further vexatious and expensive litigation. We know of nothing in the Act to prevent that. The situation is analogous to the award of interest on a fund summarily directed to be turned over to the bankruptcy court. Appellant does not contend that it is insolvent or in other respects unable to pay the amount awarded. Cf. May v. Henderson, supra, 268 U.S. pages 120 and 121, 45 S.Ct. 456, 69 L.Ed. 870.

■ 3. The court declined to allow credit for the value of improvements made on the property. Appellant argues that it took possession in good faith under claim of right, and that under an Oregon statute[5] it

2 Among these are In re Looschen Piano Case Co., 3 Cir., 266 F. 359; In re Indiana Flooring Co., 2 Cir., 62 F.2d 763; In re Fox, 3 Cir., 96 F.2d 20.

3 In re Roman, 2 Cir., 23 F.2d 556; Cowan v. Cull, 9 Cir., 289 F. 242.

4 In re 671 Prospect Avenue Holding Corporation, 2 Cir., 118 F.2d 453. There it was held that damages for the wrongful conversion of property in the bank-

rupt's possession at the date of the petition could be recovered only in a plenary suit. But the court observed that if the attempt were merely to reach the proceeds of a sale of such property, summary proceedings would be appropriate.

5 Section 5-107, Oregon Code, 1930. This statute allows a setoff for permanent improvements only where the property was held in good faith under color of ti-

was entitled to offset as against the rental value the worth of these improvements. However, in view of the finding of lack of good faith, the contention is not to be taken seriously. Milwaukee & M. R.R. Co. v. Soutter, 13 Wall. 517, 523, 20 L.Ed. 543; Irving Trust Co. v. Finance Service Co., 2 Cir., 63 F.2d 694, 696. Appellant might with propriety have been required to account for the profits it made from the operation of the property. It has made no showing in respect of profits received, and is in no'position to complain of lack of equity in respect of the disallowance of setoffs.

4. During the period of appellant's possession a portion of the ranch was condemned for the purposes of a highway and the sum of $10,000 was paid therefor. Appellant has kept the money intact in a special fund. Part of the amount was for the value of the land taken and the remainder as reimbursement for some sheds and other improvement destroyed in the construction of the highway. In the proceeding below appellant was ordered to turn over the entire amount to the trustee.

It is contended that at least so much of the money as was to compensate appellant for its improvements can not, under any theory, be regarded as belonging to the bankrupt estate. However, we believe the argument has already been answered. As a wrongdoer in possession appellant was not entitled to offset its expenditures.

5. At the time the mortgage on the Russell ranch was assigned to appellant by the Massachusetts Company, the latter as a part of the same transaction delivered to appellant additional collateral consisting of twenty drainage district bonds. The bonds were the property of Western and were in its possession at the date of the bankruptcy petition.[6] They were negotiable instruments. As part of the turnover order made in the summary proceeding appellant was required to surrender them to the trustee.

Appellant may properly be considered a holder of the bonds in due course upon proof that it had no knowledge that the bankrupt was the actual owner of them. There is no finding by the referee or by the judge that appellant knew or should have known that the bonds belonged to

Western. Evidence that it did have such knowledge has not been pointed out to us, if indeed the record contains any. The trustee concedes that a defense would be made out by appellant if it established the fact that it took the property in good faith and for a present consideration, without notice of the bankrupt's ownership. In the interest of orderly procedure the case will be remanded for a proper finding on this subject. Otherwise the order is affirmed.

tle. See Schetter v. Southern Oregon Company, 19 Or. 192, 24 P. 25.

[6] These bonds appear to be of slight value, and inadequate attention has been given them in the briefs.